Good morning, Your Honors. My name is Mark Nerheim and I'm representing Mr. Kamara. I'd like to reserve, if I could, three minutes. Your Honor, the principal issue in this case, from which everything falls, is credibility of Mr. Kamara during the testimony and the evidence that he offered in his hearing before the immigration judge in his asylum case. At the outset, I should note this is a pre-real ID case. The judge found that Mr. Kamara's witnesses had appropriate demeanor, that they were credible as to how and when they met him, and the judge also found that Mr. Kamara was also appropriate in his demeanor during the testimony that he gave. The credibility issues that the judge had in this case that he found as his basis for finding him not credible was concerning primarily the manner of his father's murder, the reasons why his father was killed, what happened to his mother, and some document issues. Our position is that the immigration judge relied, engaged in speculation, that his decision did not, he did not set the grounds of his decision, did not articulate legitimate basis to question the credibility, and the immigration judge was required to have offered specific cogent reasons for any stated disbelief in his testimony. The reasons given in an adverse credibility finding must be substantial and must relate to, have a specific nexus to the individual findings. We believe that further, if there are, if part of the adverse credibility determination is premised upon, suppose, unresponsiveness of an applicant, the decision must identify the specific areas in the record as to the instances of non-responsiveness, and ultimately, the law of the Ninth Circuit in pre-real ID asylum cases is that minor inconsistencies in the decision must be identified. Consistencies that do not go to the heart of an asylum claim or do not reveal anything about an applicant's fear for his safety are insufficient to support an adverse credibility finding. Well, the question here was, as you said, the murder of his father and the reaction of his mother, whether she fainted, didn't faint, whether she saw it, didn't see it. It's not minor. They go to the question of whether those things really happened or not. And so they are, it's a substantial reason to deny him asylum or to find him not credible if it appears to the IJ that the story isn't true because of the variations in it. So the question I think that you would want to concentrate on is why the variations that the IJ pointed out or the discrepancies, why that doesn't justify a finding that the story isn't really true. Your Honor, the first discrepancy that the judge questioned about, I believe, is whether, what was the reasons why he was murdered by the RUF rebels or the people that entered the compound. And he gave two related and connected statements. One of them was that the reason, the initial reason was that the rebels, that his father told the rebels that he was going to refuse to join them and he was trying to keep them out of the compound. And I'm not sure how those statements could have been, in any way, have been considered to be inconsistent. He was trying to keep the rebel forces out of the family compound and he did not want to join them. And those were the statements and the reasons he gave in his testimony. The immigration judge, I believe, stated, well, how come your written asylum application that had been prepared years before didn't detail both reasons? The original asylum application was prepared by someone else and at the time of the, when the asylum applications were prepared, Mr. Kumar read no English and barely spoke any English. And at the time of his hearing, he still had those disabilities coupled with the analysis that the psychologist provided that he had suffered from post-traumatic stress syndrome and that that interfered with his ability to respond at times, that it made him depressed and somewhat unresponsive in some ways, but he gave the rationale for that. And with respect to what happened to his mother, he clearly states in the record that he really didn't know exactly what happened to his mother. He said that he believed that she fainted and that he believed that she ran away, but he said that the main thing he was dealing with, I believe, in the testimony shows is he was dealing with the fact that his father was murdered right in front of him. And I think that under the circumstances, he explained, you know, any, I think satisfactorily, any potential discrepancies that related to what happened to his, both of his parents. What do we do with the additional grounds adduced by the IJ? Number one, that the purported scar, which was displayed in the courtroom, did not appear to be a scar. And second, the IJ's conclusion that it was quite improbable that soldiers would have driven four hours back to his home to retrieve identification documents, and the identification documents themselves, at least in the IJ's view, didn't look genuine. I hope I can, that was sort of a compound question, so I hope I can address all of them. It's got at least three parts to it. Okay, the first one. Number one, the scar, number one, the soldiers, number three, the documents. The scar, the BIA found that he had exhibited the scar to the court, or to the immigration judge. Well, he exhibited something. Well, but when he, I think the testimony shows, and I'm not sure exactly where it is in the record, maybe during rebuttal I can find it. But during the testimony, the immigration judge told him to stop when he was trying to show him the scar. And the immigration judge said, look, I don't need to see that, stop, stop. And there is something in the record that says that. So that's the first response on that. The psychologist said that he had also witnessed the scar, too. Now, of course, the psychologist is not a trained medical doctor to give that opinion. Of course, neither is the IJ, right. But, and the IJ, though, actually did physically tell him to stop. So that's the first issue. The second thing is, is with regards to whether the government forces, the troops, actually went back to the compound, the BIA says that they believe that it says that, let's see here, the BIA in their decision, which is page 821 of the brief, says that it's conceivable that they did go back and get them. And so I don't think that was an element of something that should be used for credibility determination when the BIA says that, yes, it's conceivable that they could have gone back and got those documents. Your third issue, Your Honor, was regarding the documents themselves. And this is pretty interesting. First of all, if you look at the documents themselves, the first thing to realize is that the immigration, that Mr. Kamara, they were all in English. And Mr. Kamara didn't read English. And the immigration judge says, well, it's missing a signature that was required on the form. Well, he wouldn't have known that it was missing a signature required to be on one of the forms or that it was missing an issue date. That didn't come up until the hearing when the judge asked. The immigration trial attorneys at the hearing didn't even ask. They never submitted those documents to the forensic documents unit. They never asked for them. They never submitted a pre-hearing statement, which they're required to do by the immigration court to lay out what their objections are to evidence or anything that's submitted. They never did that. They completely failed to do it. The immigration judge also says at one point, I have no idea what country you're from and I have no idea if these documents are good or not. But the problem was the government itself had alleged that he was from Sierra Leone, that he was who he said he was, and then admitted that. So that should have become a fact of the case that continued on all the way through. So these issues I think were almost straw men that the judge raised. If you look at the identity card that's actually in evidence here, and I think it's on page 262 of the administrative record, 262 and 263, it actually appears one of the things that the immigration judge said, it was missing a fingerprint. And on the front page of this is on 262 of the identity document. The backside shows what looks like it could be a smudge or a fingerprint. I can't tell. But that's on page 263. And the government normally in these kinds of cases, if they have questions about documents, they demand that those be produced in a pre-hearing statement or months in advance so they can be submitted to the forensic documents unit. And that never happened in this case. So, you know, I think that's our position in response to the credibility issues. Counsel, on page 140 and 141 of the administrative record, is the testimony of the petitioner regarding his father's death. And on those pages he talks about the fact that his father refused to join the rebels. He didn't say anything about the father trying to keep them from coming into the compound. Your Honor, I think he does here, and I can find that. If I can't find it before we go on here, I can find it. He did it when he was confronted with the discrepancy. But your representation gave the impression that he coupled those two together in his testimony. Well, I thought it was consistent with what my point was, is I don't think that either of those issues are inconsistent. That you're trying to keep rebel forces out of the compound, and you're refusing to join, and that's why you got shot. But when the IJ asked him to tell me specifically why your father was shot, he said because he wouldn't join the rebels. So the issue is whether or not we are compelled to make the inference that you are suggesting. Well, as a pre-Real ID Act case, I think that he explained those adequately. And he went through and he explained as best as he could what was happening. But the standard is whether we have to say that the IJ's inference was incorrect. I read that as saying that any adverse credibility finding must be supported by clear, cogent, convincing evidence. And that's the immigration judge's duty to meet that burden. And I think that that means that if the judge doesn't do that, then the court has the ability to remand the case for proper determination on credibility. If there are two proper inferences that can be drawn, and the IJ draws one, under what authority can we say that that was incorrect, or that the IJ should be, that the petition should be granted? If there are two inferences that can be drawn, and he draws one rather than the other. But they were both in the record. And his rationale for doing it, though, was that he supposedly was confused and he didn't understand what the evidence was. The rest of the evidence, though, was consistent. And on that particular case, I think that Garavidas and Singh v. Ashcroft lay that out. And also, I think that that's a minor inconsistency. I mean, what happened was all at the same time. All these events were happening in his mind. And we explained about. . . I understand your answer. You're over your time, so. . . Okay, thank you. Judge Reinhart doesn't give you more time. I'm satisfied with the answer. Thank you, counsel. Thank you. Thank you. Good morning, Your Honors. Fred Sheffield for the Attorney General. May it please the Court. We're asking that you deny this petition for review because the immigration judge and the board set forth specific and cogent reasons as to why they found that the petitioner in this case was not credible. The record evidence supports these inconsistencies, and the petitioner hasn't identified any evidence in the record which compels a contrary conclusion, which is what he must do given the standard of review in this case. I had a little difficulty telling which ones specifically he was relying on. On the scar, for instance, he says, the court is not qualified to determine whether this is a scar or not, nor is Dr. Sonnenberg, who's a psychologist. The court has no idea if the mark on the respondent's back is a scar, and if so, what caused it. That would not seem to be a finding that the testimony that it was a scar is not credible. Well, that's true, Your Honor. I mean, first of all, I would point out that the issue as to the scar was not one of the specific reasons cited by the board in finding that petitioner was not credible. My reading of the board's decision on page 2 of the record is that they're specifically pointing to the inconsistency regarding the father's death and the inconsistency regarding the mother's disappearance, and those are the primary inconsistencies that the board is relying on. So it's true that the immigration judge noted several factors that the board didn't really get to, but I think the board's finding was that based on these two inconsistencies, which are quite central to petitioner's claim, that there was enough there for them to affirm the adverse credibility. That's basically the heart of the story, whether he was killed inside or outside and whether the applicant saw his mother faint or knew what had happened to his mother. Right. Specifically with respect to the father, petitioner stated in his asylum application, which as petitioner's counsel points out, was kind of a bare-bones application, was prepared with someone else. But his affidavit, which is on page 340, that's rather extensive. That was prepared with counsel, and in that affidavit as well, he also says quite clearly that his father was killed while attempting to stop the rebels. It isn't until he testifies, and I think from my count, petitioner testified about the father episode no less than seven times. These are kind of strewn out across pages 140 through 141. Those are his direct exam testimonial statements. And then 176 and 177, that's on cross. And as Judge Rawlinson noted, his statement on direct was this, the rebels came into my house, in my father's house, and they asked my father to fight with them. My father refused, and they killed my father. So there's no reference there to his father attempting to stop the rebels. I don't know that so much as there's an inconsistency about the reasons his father was shot so much as the circumstances of his father's death. That's the way I'm reading the problem here. And I think it's certainly possible one can imagine a situation where someone attempts to prevent the rebels from entering your family compound and then afterwards is killed while refusing to join them. And I think the immigration judge and the Department of Homeland Security trial attorney were trying to get at that and make sure that that wasn't what was going on here. And what you saw was the petitioner almost mechanically repeating this line, my father was killed because he refused to join the rebels.  Again, you see that line appear about seven times in the testimony and not once do you ever see him suggest that his father was killed in the act of preventing the rebels from coming into the compound. Is there anything in the record as to the practice of the rebels recruiting adults to fight with them, as distinct from children? The country reports that are in the record are a 2003 report and a 2004 report. I briefly looked over them and I don't know if because these reports are post the war. So my guess is that the reports in 2000 and 1999 would have been speaking more closely to that issue. I think the reports that are in the record speak more about the reconstruction process and things of that nature. And that is not a reason given by either the EIJ or the BIA? Correct, correct. We're really talking about these two inconsistencies and whether really the record compels a finding that these two inconsistencies. When you say two inconsistencies, you mean one with respect to his father and two with respect to his mother? That's the second one. The other one was with respect to his mother. He states on page 141 of the record that his mother fled. That's the first time he's describing the incident on direct. Then on page 174 of the record, he again states that his mother, quote, just ran. And so again, on cross-examination, the trial attorney asked Petitioner, what's going on here? Is it that your mother fled or is it that your mother passed out? And eventually on page 178, he's asked about this about four times and he finally concedes that he doesn't really know whether his mother fled or whether his mother passed out. In fact, he just lost sight of her. And then kind of curiously enough, once we get a little bit later in the testimony on page 200, Petitioner's own counsel was kind of trying to clarify, well, what did you mean by passed out? And saying if there might have been an explanation. And Petitioner says again, well, what I meant by passed out is that she fainted. So he seemed to be going back and forth between whether she fled, whether she passed out. Then he kind of arrives at the statement of, well, I don't really know what happened to her. And then towards the end of his testimony, he's back to saying that she fainted. We would just reiterate that these are in fact inconsistencies that do go to the heart of the claim because this is an event that really triggered the claim. I think our position is that this is a fairly clear case. These inconsistencies are well supported. The inconsistencies go to the heart of the claim. And on that basis, the court should deny the petition. But as your Honor, Judge Lawson noted, even if this is a close case, even if there can be two inferences drawn based on the standard review at play here, the court should still deny the petition. Subject to the court's questions, we'll rest on our brief. Is there inconsistency about whether he was in the house or outside of the house when his father was killed? I don't recall any inconsistency about that particular issue. And I don't think the judge or the board relied on that inconsistency. I think it was more about the circumstances of the father's death,  or whether he was killed while asking him to join. I know there was a lot of discussion about what kind of house or compound this was. And in situations like this, those kind of details can get a little fuzzy because the word household might mean compound, something like that. But I don't think that's really a problem in this case because the difference between refusal to join and attempting to stop was put to Respondent, as I said, at least seven times. And Respondent had an opportunity to say, well, both are true. And he never did that. So I think, again, that's why the record does not compel the conclusion that petitioner was found. So is it your understanding that all three, the mother, the father, and the son, according to his testimony, were in the house at the time of the murder? They were in at least the family compound. That's my understanding. Whether they were actually inside a physical structure, I think the testimony kind of varied on that. My understanding was that petitioner himself was outside of any particular structure, but inside the family compound. So your basic inconsistency then is as to what the rebels intended, according to the father or according to the son, what their purpose was. And secondly, whether his mother fainted or fled. Are those the two items? I wouldn't so much say it was the rebels' purpose so much as just how the whole scene unfolded. For example, the petitioner apparently told the psychologist that he visited that his father was shot immediately. That's what's in the psychologist's report at AR-323. And that story is quite a bit different from the petitioner's direct exam testimony, where he again states, the rebels came into my house, in my father's house. They asked my father to fight with them. When my father refused, they killed him. That's a different story than saying my father was shot immediately. And to the extent that, as I said, to the extent that they could even both be true, the petitioner was given the opportunity to say they're both true. And when confronted with that, he again repeatedly said over and over, my father was killed because he refused to join the rebels. At no point did he ever say that he attempted to – that his father was killed while attempting to prevent the rebels from entering. Thank you, Ken. Thank you. Your time's up, but we'll give you two minutes to respond. I wanted to turn really quickly to what Judge Rawlinson had asked. Originally in his – at page 340 of his more detailed affidavit, he did say initially that the rebels came into the compound and my father tried to stop them. So I think that's consistent with what the original question was about, if he had said that before and at least to that extent. The bigger issue here, I guess, on the compound question versus house, is there were translation issues. I don't think the government's relying on the difference between compound and house. They're relying on what happened when the rebels came in. Sure. I understand, Judge Reinhart. And what I was going to get to was the issue about the immediacy and how quickly the events happened. And in circumstances like that, I would think that even if this discussion came out about you can't come in, I'm not going to join you, and then they kill your father in front of you, those circumstances could seem like they were very immediate or they might have taken some time. And it's hard to say when he says immediately whether immediate means within five minutes, within ten minutes, within 30 seconds. And I think under the circumstances, this notion of immediacy, given the translation issues, his problems with the English language at the time of the hearing, and I'm not saying there were specific identifiable problems with the translation, but that's always a problem, though, any time you have these kinds of hearings. And I think that that issue about immediacy, I think it's within reason that it could have covered several minutes of time. What's your explanation of the mother, whether she fled or fainted or both? You know, he says early on, I think, in this affidavit here, that he wasn't, he really, he even says back here he wasn't sure what happened to his mother. He says, my mother was so afraid she passed out I've not seen her from her since. My mother was at home at the time. I do not for sure or believe whether I know that she is dead or not. That's at page 340. You know, other than the circumstances where rebels were coming into your compound, I mean, it's understandable that your memory as to exactly where everybody was and what you believed conflates with the reality. I mean, it's very hard to determine. Whether your mother passed out or whether she ran, those are two very different concepts in terms of your memory. Without trying to, I think it's possible that she could have fainted and that because he didn't see her again he assumed that she ran away. I don't know if, I can't tell you for sure if that means that he physically saw her run away. But the I.J. was entitled to draw an adverse credibility termination from the discrepancy. There may be alternative explanations, but why is the I.J. compelled to believe that he's credible when the story changes? Well, consistently, I mean, he's saying that the crowning main event that caused him to apply for asylum was because his father was murdered and was murdered in front of him. But the details are used to determine how credible someone is. If the details are believable, then the story is believable. If the details aren't believable, the story isn't believable. That's why the devil's in the details in these cases. But as the court held, though, under those line of cases, the pre-I.D. cases, which this case falls underneath, that a detail could be a minor inconsistency. And if it's a minor inconsistency as a detail in these kinds of cases, then that shouldn't be enough to throw the case out. But the details that surround the central reason that the petitioner is claiming asylum are not minor details. But the central issue, though, as he stated, is what happened to his father, and his father was murdered in front of him. And that's, I think, the central claim. And once again, I believe that anything else in here was a minor inconsistency. All right. Thank you, counsel. Thank you. The case just argued will be submitted.
judges: Reinhardt, Fletcher W. , Rawlinson